# EXHIBIT 1

**VIRGINIA:**

**FILED**

**JUN 26 2024**

**IN THE CIRCUIT COURT OF FAIRFAX COUNTY**

CHRISTOPHER J. FALCON
Clerk of the Circuit Court
of Fairfax County, VA

|  |  |  |
|---|---|---|
| **WILLIAM JOSEPH DEMIERO,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. **2024   9012** |
| | ) | |
| **DIGIDAY MEDIA,** | ) | |
| 462 7th Avenue | ) | |
| Office 601 | ) | |
| New York, NY 10018 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff William Joseph DeMiero ("Plaintiff" or "Mr. DeMiero"), in support of his Complaint against Digiday Media ("Digiday" or "Defendant"), hereby states the following:

## NATURE OF THE ACTION

1.      This defamation action arises from an article published on Digiday's online platform on December 8, 2023 titled, "After rocky tenure, UM replaces U.S. CEO with chief client officer Erin Quintana" (the "Article" or the "Digiday Article"). A true and correct copy of the Article is attached hereto and incorporated by reference as **Exhibit A**.

2.      The Article contains numerous false and defamatory statements about Mr. DeMiero intended to suggest that Mr. DeMiero was ineffective as a CEO, responsible for the loss of business and key talent, and that he did not leave Interpublic Group (IPG) of his own volition.

3.      As a direct result of the publication of the Article, Mr. DeMiero has suffered significant losses, including the loss of new employment opportunities.

## PARTIES

4.     Plaintiff William Joseph DeMiero is an individual and a resident of the State of Texas.

5.     Defendant Digiday Media is an online digital media platform with its headquarters in New York.

## JURISDICTION AND VENUE

6.     This Court has general and specific personal jurisdiction over Defendant under Virginia's long-arm statute, Va. Code § 8.01-328.1(A)(1), (3), and (4), as well as under the Due Process Clause of the U.S. Constitution. Digiday is hosted on Amazon Web Services and is published through servers located in Herndon, Virginia. Thus, the Article at issue was published in Virginia, involved "[u]sing a computer or computer network located in the Commonwealth" which in turns "constitute[s] an act in the Commonwealth" (*see* Va. Code § 8.01-328.1(B)), and Virginia is the *lex loci delicti* (*i.e.*, the place of the wrong). And not only was *the* Article published in Virginia, but *every* article published every single day by Digiday is published in Virginia. This represents the type of continuous and systematic connection to Virginia that supports the exercise of general personal jurisdiction (in addition to specific personal jurisdiction).

7.     Moreover, the Article was designed to attract and serve Virginia readers and cause reputational harm in Virginia. The subject matter of the Article is Mr. DeMiero's purportedly "rocky" tenure at Universal McCann ("UM"), whose parent company (Interpublic Group, or "IPG" as referenced in the Article) maintains offices in Virginia, including the headquarters of The Martin Agency (which was established in Virginia in 1965) and Octagon (which maintains offices in McLean), where Mr. DeMiero regularly worked and oversaw IPG's numerous

2

employees in Virginia, including high-level executives like UM's general counsel. The Article further discusses UM's numerous clients with whom Mr. DeMiero worked, some of whom are headquartered in Virginia, and many of whom have thousands of employees and do business in Virginia. Digiday is a U.S.-based trade publication that has published more than 500 articles referencing or about Virginia-based advertising agencies or subjects. Thus, Digiday knew and intended for the article to be of targeted interest to Virginia readers and knew and intended for the harm caused by the article to occur in Virginia. This is evidenced by the fact at least one of the employment opportunities Mr. DeMiero lost as a result of the Article involved oversight and operations in Virginia. For these reasons, the cause action in this Complaint arises from Defendant's transacting business in the Commonwealth and causing tortious injury by an act or omission in the Commonwealth. Exercising jurisdiction would not offend traditional notions of fair play and substantial justice because Defendant could have reasonably foreseen being haled into a Virginia court to account for the false and defamatory Article which they published in Virginia.

8.    Venue is proper in this circuit under Va. Code § 8.01-262 because the cause of action asserted herein arose in this Circuit.

## FACTS

### *Mr. DeMiero's Tenure at UM*

9.    Mr. DeMiero was appointed U.S. CEO of UM in January 2022.

10.    In this role, he reported to the Global CEO, who in turn reported to a business unit CEO, who in turn reported to the CEO of publicly traded parent company Interpublic Group (IPG).

3

11.    During Mr. DeMiero's tenure, UM won several new accounts, including GEICO and General Mills, which were two of the biggest reviews in the industry in 2022 and 2023.

12.    Also during Mr. DeMiero's tenure, UM received multiple public awards in recognition of its performance, including Ad Age's "U.S. Media Agency of the Year"; Campaign's "Media Agency Global Network of the Year"; and thirteen different "Best Places to Work" recognitions, including Fortune's "Best Workplaces", Newsweek's "Greatest Workplaces for Diversity", and Campaign's "Sustainability Standout".

13.    In 2023, Mr. DeMiero's father became severely ill, and was placed in hospice care. Mr. DeMiero departed IPG in a mutually-agreed-upon manner, so that he could care for his father's immediate medical needs. The decision for Mr. DeMiero to step down was not prompted in any way by his performance as U.S. CEO of UM or UM's business performance.

*Publication of the Digiday Article*

14.    On December 8, 2023, Digiday published an article by Michael Bürgi on its online platform hosted in Virginia with the title, "After rocky tenure, UM replaces U.S. CEO with chief client officer Erin Quintana" (the "Digiday Article" or the "Article").

15.    Prior to the publication of the Article, neither Mr. Bürgi nor anyone else at Digiday contacted Mr. DeMiero for comment on the Article.

16.    The central theme of the Article was that Mr. DeMiero was ineffective as a CEO and left under unfavorable circumstances.

17.    Seemingly reflecting the amount of due diligence that went into the Article, Mr. DeMiero's name was spelled incorrectly throughout as "Joe DiMiero".

18.    The Article contained numerous false and defamatory statements.  In the Article, Mr. Bürgi wrote:

- "After rocky tenure, UM replaces U.S. CEO with chief client officer Erin Quintana"

- "Quintana replaces Joe DiMiero, who was appointed U.S. CEO in January 2022 but has had a troubled tenure marked by client losses, a questionable management style and high-level executive departures."

- "DeMiero, who internal sources said hasn't been seen for weeks in meetings he was expected to attend…."

- "Under DeMiero, there have been at least three rounds of layoffs in 2023…."

- "One of those sources attributed the loss of clients Nationwide and Zillow to DiMiero."

- "Two sources said DiMiero ultimately ran afoul of Eileen Kiernan, global CEO of Mediabrands, the umbrella under which UM sits alongside Mediahub, Initiative and Magna."

19.     And to promote traffic to the article from readers based in Virginia and elsewhere, Mr. Bürgi posted to X/Twitter: "Joe's tenure was, shall we say, troubled" with a link to the article. Digiday then liked Mr. Bürgi's post.

### *The Statements in the Digiday Article Were False and Defamatory*

20.     The statements in Digiday's Article are demonstrably false and defamatory.

21.     As set forth above, during Mr. DeMiero's tenure, UM won numerous public awards in recognition of its success. These included Ad Age's "U.S. Media Agency of the Year" award, and Campaign's "Media Agency Global Network of the Year" award.

22.     Additionally, during Mr. DeMiero's time as U.S. CEO, UM significantly increased its commerce billings, making it the largest commerce practice in the industry.

23.     Contrary to the statements in the Digiday Article, *no one* on Mr. DeMiero's executive leadership team left the agency during his tenure.  The executive departures that took place at the agency during Mr. DeMiero's tenure were all by members of the UM Global team, which was not part of Mr. DeMiero's purview as U.S. CEO of UM.

5

24.     Three executives departed during Mr. DeMiero's tenure, all of whom reported to or were in the chain of command for UM's Global CEO, not Mr. DeMiero.

25.     Two of those executives wrote public articles about why they departed UM. Neither article mentioned Mr. DeMiero, or anything relating to him.

26.     Nor were there any layoffs, let alone "three rounds of layoffs," attributable to Mr. DeMiero's purview as UM's U.S. CEO in 2023. Any layoffs that allegedly occurred in 2023, again, were part of UM Global, which was *not* under Mr. DeMiero's purview as U.S. CEO of UM. Instead, throughout Mr. DeMiero's tenure and at the time the Digiday Article was published, UM was seeking to expand its workforce and had dozens of open new hire positions posted to its "careers" website and on LinkedIn. This job creation was a direct result of Mr. DeMiero's new business wins and organic growth of current clients as U.S. CEO. As has been reported in other trade publications, under Mr. DeMiero's leadership, UM U.S. saw 36% year-over-year improvement in new business wins, and organic growth across 40% of its clients.

27.     Further, contrary to the Digiday Article's statement that Mr. DeMiero "hasn't been seen for weeks in meetings he was expected to attend", Mr. DeMiero did not miss any meeting that he was scheduled to (and therefore expected to) attend in the months prior to his departure.

28.     In the weeks prior to the publication of the Digiday Article, Mr. DeMiero was actively involved in more than a dozen new business pitches and had a full schedule of client and internal meetings in Los Angeles, Detroit, and New York.  He also participated as a panelist at industry events during this period.

29.     Also in the weeks prior to publication of the Article, Mr. DeMiero held weekly all-agency meetings broadcast on Zoom for all employees.

30.     While he served as U.S. CEO, Mr. DeMiero's schedule was published internally and could therefore be easily reviewed.

31.     Moreover, contrary to the statements in the Article, UM did not "lose" Zillow or Nationwide as clients due to Mr. DeMiero. UM transferred Zillow as a client to a sister agency, Mediahub, due to a conflict with another client. And, Nationwide gave UM notice that it was putting its business under review *before* Mr. DeMiero joined UM. The loss of such business clearly is not attributable to Mr. DeMiero.

32.     Finally, the Article falsely states that Mr. DeMiero "ran afoul" of global CEO Eileen Kiernan.  To the contrary, Mr. DeMiero and Ms. Kiernan remain friends as well as close professional contacts. On numerous occasions, both verbally and in writing, Ms. Kiernan has spoken favorably about Mr. DeMiero and his tenure at UM, and rated him "exceeds" in his performance reviews, the highest possible rating.

*Consequences of the Digiday Article*

33.     Publication of the Digiday Article has caused Mr. DeMiero to suffer significant lost opportunities for new employment. These losses are directly attributable to the statements made in the Article.

34.     Following his departure from UM, Mr. DeMiero was being considered for the Chief Marketing Officer position at an international restaurant chain.

35.     Mr. DeMiero had engaged in numerous discussions with leaders at that international restaurant chain, with significant operations in Virginia, including that company's Chief People Officer ("CPO") in early 2024, and was made aware he was the only candidate left in their search for the position.

36.     On February 16, 2024 the restaurant chain's CPO texted a link to the Digiday Article to Mr. DeMiero and wrote, "Hey Joe have time to chat about this today?"

37.     Mr. DeMiero replied "of course" and asked the restaurant chain's CPO what time he could speak that day.

38.     On February 26, 2024, Mr. DeMiero texted the restaurant chain's CPO and asked if the restaurant chain's CPO had "a few minutes to catch up today".

39.     The restaurant chain's CPO did not reply until the following day, February 27, 2024, and stated: "Hey Joe busy time board next week.  Can I give you a shout tomorrow?".

40.     On February 28, 2024, Mr. DeMiero emailed the restaurant chain's CEO and wrote: "[CPO] called me to chat about the Digiday article, but I wanted to reach out directly to see if you have a few minutes to connect."  Mr. DeMiero further wrote: "As I shared with [CPO], the article came as a real sucker punch, because there is zero truth to what is in it, it was harmful to former clients and current employees, and was an unfounded personal attack on me."

41.     On March 11, 2024, Mr. DeMiero texted the restaurant chain's CPO to check in. Mr. DeMiero wrote: "I emailed [CEO] but haven't heard back yet.  Let me know what you suggest."

42.     On March 19, 2024, the restaurant chain's CEO replied to Mr. DeMiero's February 28th email and wrote to tell Mr. DeMiero he was no longer being considered for the role: "I am actually going to split the CMO role up into a couple different roles and look at resourcing the work a little differently."

43.     Multiple other potential employers have brought up the Article and stopped potential future employment conversations as a direct result of the Article.

44.     Mr. DeMiero brings this action now to clear his name and hold Digiday accountable for its false and defamatory content.

**COUNT ONE**
(Defamation/Defamation *per se*)

45.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

46.     Defendant published the Article on December 8, 2023 on its online platform via servers located in Virginia.

47.     The Digiday Article contained the following false and defamatory statements concerning Mr. DeMiero:

- "After rocky tenure, UM replaces U.S. CEO with chief client officer Erin Quintana"

- "Quintana replaces Joe DiMiero, who was appointed U.S. CEO in January 2022 but has had a troubled tenure marked by client losses, a questionable management style and high-level executive departures."

- "DeMiero, who internal sources said hasn't been seen for weeks in meetings he was expected to attend…."

- "Under DeMiero, there have been at least three rounds of layoffs in 2023…."

- "One of those sources attributed the loss of clients Nationwide and Zillow to DiMiero."

- "Two sources said DiMiero ultimately ran afoul of Eileen Kiernan, global CEO of Mediabrands, the umbrella under which UM sits alongside Mediahub, Initiative and Magna."

48.     These statements are of and concerning Mr. DeMiero, as he is explicitly named in the Digiday Article, albeit with his name spelled incorrectly.

49.     These statements, which imply that Mr. DeMiero was ineffective as a CEO and left under unfavorable terms, are false.

9

50.     At the time of publication, Defendant knew these statements were false, and the statements were made with malice and/or a reckless disregard for the truth. Any reasonable due diligence would have revealed these claims to be false.

51.     Moreover, upon information and belief, Digidays "sources" clearly bear ill will towards Mr. DeMiero, raising obvious doubts as to the veracity of their statements.

52.     At a minimum, the statements were negligently made and Digiday failed to adequately investigate the information published in the Article.

53.     By publishing these false statements, Defendant caused harm to Mr. DeMiero's reputation. The injury to Mr. DeMiero's reputation from Defendant's false statements is readily apparent as they lower him in the estimation of the community and deter third persons from associating or dealing with him.

54.     As a direct and proximate result of these false statements by Defendant, Mr. DeMiero has suffered damages, including, *inter alia*, injury to his reputation, harm to his ability to carry out his profession, embarrassment, humiliation, and emotional distress.

55.     Defendant's false statements also are defamatory *per se* because they suggest Mr. DeMiero is unfit to perform the duties of his employment and hurt him in his chosen profession/trade.

56.     Defendant's actions were malicious, willful, and wanton, and evidence a conscious disregard of Mr. DeMiero's rights. Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor and against Defendant, as follows:

(1)     awarding Mr. DeMiero damages of $15,000,000;

10

    (2)     awarding Mr. DeMiero punitive damages to the maximum extent permitted by the

laws of this Commonwealth; and

    (3)     granting such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Plaintiff William Joseph DeMiero hereby demands a jury trial on all issues so triable.

Dated: June 26, 2024                    Respectfully submitted,

                                     **William Joseph DeMiero**

                                     By his attorneys,

                                     **BROWN RUDNICK LLP**

                                     *Andrew Crawford*

                                     Benjamin G. Chew (VSB #29113)
                                     Andrew C. Crawford (VSB #89093)
                                     BROWN RUDNICK LLP
                                     601 13th Street, NW, Suite 600
                                     Washington D.C. 20005
                                     Tel.: 202-536-1785
                                     BChew@brownrudnick.com
                                     ACrawford@brownrudnick.com

                                     **ROGGE DUNN GROUP**

                                     Rogge Dunn (*pro hac vice* forthcoming)
                                     Katie Blakey (*pro hac vice* forthcoming)
                                     Rogge Dunn Group,  PC
                                     500 N. Akard Street, Suite 1900
                                     Dallas, Texas 75201-6629
                                     Tel.: 214-220-0077
                                     dunn@roggedunngroup.com
                                     blakey@roggedunngroup.com

# Exhibit A

# DIGIDAY

AGENCY CULTURE

# After rocky tenure, UM replaces U.S. CEO with chief client officer Erin Quintana

By Michael Bürgi  •  December 8, 2023  •  2 min read  •
f 🐦 in 👍



Ivy Liu

IPG's media agency UM named Erin Quintana, chief client officer and a 15-year veteran of the company, to be its new U.S. CEO. Quintana replaces Joe DiMiero, who was appointed U.S. CEO in January 2022 but has had a troubled tenure marked by client losses, a questionable management style and high-level executive departures.

DiMiero, who internal sources said hasn't been seen for weeks in meetings he was expected to attend, has taken a leave of absence, according to a representative, who didn't elaborate. His name wasn't mentioned in the press release on Dec. 8 announcing Quintana's promotion to CEO.

Under DiMiero, there have been at least three rounds of layoffs in 2023, according to internal sources who reached out to Digiday following a story on client losses and executive departures earlier this week. One of those sources attributed the loss of clients Nationwide and Zillow to DiMiero.

Other sources allege he ran a shadow leadership team out of Dallas, where he was based. "He's been ineffective and has no presence," said one internal source who also said earlier this week that DiMiero's departure was imminent.

Two sources said DiMiero ultimately ran afoul of Eileen Kiernan, global CEO of Mediabrands, the umbrella under which UM sits alongside Mediahub, Initiative and Magna. Kiernan had hired DiMiero, according to sources with knowledge of his onboarding back in 2022. Kiernan was unavailable for comment.

Quintana, conversely, was complimented by some of these sources, on her strong client relationships. She will report to UM's global CEO Andrea Suarez, who was appointed to that role following the sudden departure of Sasha Savic earlier this summer.

Previously, Quintana oversaw all account management, and is credited with leading the pitch that won UM the global General Mills business. She previously served as evp, global client lead, in charge of accounts including Johnson & Johnson and American Express.

**TRENDING IN AGENCY CULTURE**

01    MEMBER EXCLUSIVE
**Media Buying Briefing: Why Brett Marchand doesn't see Plus Company as a holding company**


02    MEMBER EXCLUSIVE
**Digiday Media Agency Report 2023: The state and future of the media agency, from client spending to AI's impact**


SPONSORED
**How advertisers are addressing media wastage**


03    AGENCY CULTURE
**GroupM North America CEO Kirk McDonald exits in senior shake up**


⊙  # Sign up for the Digiday Daily Newsletter

Get the latest news on media, marketing and the future of TV, delivered each weekday morning.

delivered each weekday morning

Business email
_____

Job title
_____ [ SIGN UP ]

"As the Head of J3 (now Onevue), UM's bespoke unit dedicated to the J&J business, she brought all components of the client's media buying business under one umbrella for the first time ever while delivering award-winning work and driving a culture of collaboration and support," read the press release announcing Quintana's appointment.

"I am thrilled at the opportunity to lead UM U.S. after spending more than half of my career within this incredibly special community and experiencing so many different parts of the business," Quintana said in that same statement. "We have strong momentum at our backs that I am excited to accelerate in 2024 through a focus on growth for our clients, our community and our industry."

https://digiday.com/?p=528394

## Stories like this, in your inbox each morning

Business Email
_____

Job Title
_____ [ SIGN UP ]

**MOST READ**

01 AGENCY CULTURE
**After rocky tenure, UM replaces U.S. CEO with chief client officer Erin Quintana**

02 EVOLVING AGENCIES
**UM and Magna undergo multiple rounds of layoffs amid client losses**

03 GAMING & ESPORTS
**Here is how Lego's partnership with Fortnite stacks up as an example of video game brand marketing**

04 LOOKING BACK/AHEAD TO 2024
**Why the first Grand Theft Auto 6 trailer might be gaming's biggest marketing moment of 2023**

05 DIGIDAY PROGRAMMATIC MARKETING SUMMIT
**Why the ad industry still isn't ready for Google to remove third-party cookies in Chrome**

## MORE IN MEDIA BUYING

VIEW MORE ›



THE HISTORY OF AD TECH

**A History of Ad Tech Chapter 2: The Ad Net's Golden Age**

December 11, 2023 • 8 min read

How ad tech recovered from the dotcom crash, Big tech grew to dominate and the financial crisis fueled programmatic buying.



GENERATIVE AI

**AI Briefing: As tech giants add more AI tools, Runway and Getty Images team up**

December 11, 2023 • 5 min read

As Google and Meta roll out new features, startups like Runway are finding new ways to compete for enterprise clients.



MEMBER EXCLUSIVE

**Media Buying Briefing: Omnicom Media Group's CEO on the economy, fraud, the quadropoly and 'agency as a platform'**

December 11, 2023 • 8 min read

Florian "Flo" Adamski weighed in on what 2024 looks like for his company and their clients, while explaining why the industry is still seriously addressing ad fraud.

---

**DIGIDAY+**

Get access to tools and analysis to stay ahead of the trends transforming media and marketing

SUBSCRIBE

**NEWSLETTER**

Get Digiday's top stories every morning in your email inbox.

Business email          SIGN UP

**CONNECT**

Follow @Digiday for the latest news, insider access to events and more.

